UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CHRISTOPHER J. FORRETTE,     )
       Plaintiff,         )
                       )
                       )
     v.                  )     Civil No. 3:19-cv-30089-KAR
                       )
                       )
ANDREW M. SAUL,           )
Commissioner of the Social     )
Security Administration,[1]      )
       Defendant.       )
                       )


MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
DEFENDANT'S MOTION TO AFFFIRM THE COMMISSIONER'S DECISION
(Dkt. Nos. 15 and 17)

ROBERTSON, U.S.M.J.

## I.  Introduction and Procedural History

Christopher J. Forrette ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g)

and 1383(c)(3) seeking review of a final decision of the Commissioner of Social Security

("Commissioner") denying his application for Social Security Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI").  Plaintiff applied for DIB and SSI on

September 22, 2016, alleging an onset date of December 12, 2015 (Administrative Record

("A.R.") 263-269).  At the outset, Plaintiff claimed disability due to cervical spine degeneration,

bulging discs and minor scoliosis of the thoracic spine, sleep apnea, depression, anxiety, and

substance abuse (A.R. 290).  His applications were denied initially (A.R. 108-145) and on

---

[1] Andrew M. Saul has been substituted pursuant to Fed. R. Civ. P. 25(d) for Nancy A. Berryhill, the former Acting Commissioner of the Social Security Administration.

reconsideration (A.R. 146-182).  He requested a hearing before an Administrative Law Judge ("ALJ") (A.R. 203-204), and one was held on May 18, 2018 (A.R. 48-107).  On August 30, 2018, the ALJ issued an unfavorable decision (A.R. 25-47).  Plaintiff sought review by the Appeals Council (A.R. 256-262), which denied relief (A.R. 2-7).  Thus, the ALJ's decision became the final decision of the Commissioner and this suit followed.

Plaintiff appeals from the ALJ's decision on the grounds that the ALJ erred by not assessing controlling weight to the opinion of his treating physician and by improperly diminishing Plaintiff's credibility.  Pending before this court is Plaintiff's motion for an order reversing the Commissioner's decision (Dkt. No. 15), and the Commissioner's motion for an order affirming the Commissioner's decision (Dkt. No. 17).  The parties have consented to this court's jurisdiction (Dkt. No. 13).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons stated below, the court DENIES Plaintiff's motion and GRANTS the Commissioner's motion.

## II.     Legal Standards

### A.  Standard for Entitlement to DIB and SSI

In order to qualify for DIB and SSI, a claimant must demonstrate that he is disabled within the meaning of the Social Security Act.[2]  A claimant is disabled for purposes of DIB and SSI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is unable to engage in any substantial gainful activity when he is not only "unable to do his previous work, but cannot, considering his

---

[2] There is no challenge to Plaintiff's insured status for purposes of entitlement to DIB, *see* 42 U.S.C. § 423(a)(1)(A), or to his financial need for purposes of entitlement to SSI, *see* 42 U.S.C. § 1381a.

age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration. *See* 20 C.F.R. § 404.1520(a)(4)(i-v).[3] The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. 20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See id.*

> RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s),

---

[3] The administrative regulations applicable to Title II (DIB) are found in 20 C.F.R. Part 404, while the regulations applicable to Title XVI (SSI) are found in 20 C.F.R. Part 416. Because the Title II and Title XVI regulations do not differ substantively, the court generally relies on the Title II regulations in this Memorandum and Order.

> including any related symptoms, such as pain, may cause physical
> or mental limitations or restrictions that may affect his or her
> capacity to do work-related physical and mental activities

Social Security Ruling 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate RFC. *Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations. *Goodermote*, 690 F.2d at 7.

B. Standard of Review

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo*, but "the ALJ's findings shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (mem.) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)). "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51,

56 (1st Cir. 2003)).  In applying the substantial evidence standard, the court must be mindful that

it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve

conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee,* 744 F.

App'x. at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters

entrusted to experts.  *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

## III.    Relevant Facts

### A.  Plaintiff's Background

Plaintiff was thirty-five years old on the date of the hearing before the ALJ (A.R. 38,

263).  He has a G.E.D., attended some college, and obtained a commercial driver's license (A.R.

64, 66, 291).  He has worked as a garbage collection supervisor, a garbage truck driver, a tow

truck operator, an assembler, and a cashier (A.R. 38, 60-67, 305).

### B.  Medical Record Relative to Plaintiff's Claims[4]

On September 28, 2015, Plaintiff presented to Paul Azimov, D.O., with Riverbend

Medical Group for follow-up for neck pain and cervical radiculitis (A.R. 514).  Plaintiff was off

narcotic medications and had started receiving suboxone (A.R. 514).  Plaintiff had been started

on gabapentin, which was "definitely working;" his pain was manageable on his current dose

(A.R. 514).  Plaintiff had restricted extension and left rotation of the cervical spine, but his

bilateral shoulder, elbow, and wrist range of motion were within normal limits (A.R. 514).  A

Spurling maneuver was negative, his neurologic functioning was intact, and he had no difficulty

walking or going from sitting to standing (A.R. 516).  Review of an October 2014 cervical MRI

showed possible nerve-root compression at C4, C6, and C7 (A.R. 516-517).  Dr. Azimov's

---

[4] Neither of the issues Plaintiff is pressing on appeal relate to his alleged mental impairments and, therefore, only his treatment for his alleged physical impairments is summarized here.

impression was of persistent neck and mid-back pain status post cervical discectomy on October 18, 2010 and April 20, 2014 (A.R. 518).

On August 2, 2016, Plaintiff saw Jessica Anchor-Samuels, M.D., with Riverbend Medical Group for neck pain (A.R. 499).  Plaintiff reported that he was doing very poorly despite being out of work for six months and avoiding strenuous activity (A.R. 499).  Plaintiff's neck and arms were worse, and he was getting severe pain attacks every few days, making it difficult to get out of bed (A.R. 499).  He reported right arm numbness and left arm pain and numbness, as well as muscle twitching (A.R. 499).  Upon physical examination, Plaintiff had mild midline cervical tenderness at the lower vertebrae, mild pain to palpation in the cervical and thoracic spine midline and paraspinous muscles, decreased sensation in the right arm, and pain radiating down the left arm (A.R. 501).  Dr. Anchor-Samuels determined that an updated MRI was needed (A.R. 501).

Plaintiff presented for the MRI of his cervical spine on August 14, 2016 (A.R. 445).  The MRI showed "substantially increased left posterior disc osteophyte complex at C6-7 with lateral recess narrowing and minimal impression on the anterior cord" (A.R. 445).  In addition, it was noted that there had been "some progressions of neuroforaminal on the left at this level as well, now severe" (A.R. 445).

Plaintiff saw Dr. Anchor-Samuels again on September 20, 2016 (A.R. 494).  Plaintiff reported that he could no longer work and had been out of work for many months (A.R. 494).  He reported that he could not stand a long time, drive, or lift, and that it was difficult for him to do the activities of daily living, such as grooming, shopping, and cleaning because his stamina was so low (A.R. 494).  Plaintiff exhibited mild pain to palpation in the cervical and thoracic spine midline and paraspinous muscles (A.R. 496).  He had decreased sensation in the right arm

and pain radiating down the left arm (A.R. 496).  Dr. Anchor-Samuels noted that she reviewed

Plaintiff's disability form with him at length and that they completed much of it together (A.R.

496).

On November 8, 2016, Plaintiff saw Beenish Hafiz, M.D., for a rheumatology evaluation

(A.R. 580).  Plaintiff was noted to have chronic pain in his cervical spine with radicular

symptoms in his arms and significantly milder pain in his low back (A.R. 580).  Regarding his

neck pain, Plaintiff noted that he had tried every type of nonsurgical treatment without success,

so he underwent a surgical fusion, which also did not help the neck pain (A.R. 580).  Dr. Hafiz

opined that Plaintiff's imaging studies showed extensive degenerative arthritis of the cervical

spine, but that his clinical picture was not concerning for seronegative spondyloarthropathy

(A.R. 585).

Plaintiff saw Joseph M. Chappell, PA-C, on November 11, 2016 (A.R. 574).  Plaintiff

reported that he had been unable to work since December 2015, but had not noticed any

improvement in his neck pain (A.R. 574).  Plaintiff rated his pain level as an 8 out of 10, with his

highest pain level in the last two days being a 10 out of 10 (A.R. 574).  Plaintiff had a restricted

range of motion in his neck, but his strength and sensation were intact, and he had full range of

motion in his upper extremities (A.R. 576-577).  His gait was normal without an assistive device,

and he moved from sitting to standing without difficulty (A.R. 576).  Mr. Chappell noted that

Plaintiff's symptoms were worsening consistent with his MRI findings and that he did not wish

to repeat cervical epidural injections, which had provided no relief (A.R. 580).  Mr. Chappell

referred Plaintiff to Dennis Oh, M.D., for a neurosurgical consultation (A.R. 580).

Plaintiff saw Dr. Oh on December 8, 2016 (A.R. 556).  Plaintiff reported that the last year

had been "marked by increasing pain on the sides of his neck down to the trapezius area,

sometimes with extension up the side of the head, but no real shooting radicular pain down either arm, although he d[id] report some numbness in the left upper extremity" (A.R. 556). Plaintiff exhibited bilateral hand tremors (A.R. 556). Upon examination, Plaintiff showed good strength, and he had good neck range of motion, although he could not turn his head fully to the left (A.R. 556). Plaintiff had some discomfort on neck extension, but none of the positions or movements caused radiating pain down the left arm (A.R. 556). Dr. Oh reviewed Plaintiff's MRI from August 2016, noting that it showed C6-C7 disc osteophyte causing moderate foraminal stenosis on the left and which may account for the numbness in his left upper extremity (A.R. 556-557). Because Plaintiff's primary complaint was of axial pain, Dr. Oh was of the opinion that surgery would not give him much benefit (A.R. 557). He recommended follow-up with Dr. Azimov for consideration of non-surgical treatment options (A.R. 557).

On August 27, 2017, Plaintiff presented to Baystate Medical Center emergency department for nontraumatic left hip pain (A.R. 957). It was noted that Plaintiff suffered from "multiple spine issues" that included "[o]ngoing neck and back pain (chronic) with right leg radiculopathy" (A.R. 957). Plaintiff was ambulating with a cane (A.R. 957). Plaintiff's range of motion was intact with encouragement and assistance (A.R. 959). He was diagnosed with trochanteric bursitis of the left hip and given a prescription for a five-day supply of Percocet (A.R. 959).

On September 27, 2017, Plaintiff went for a new patient appointment with Martin Lesser, D.O., with Western Mass Physician Associates (A.R. 1043). Plaintiff reported that his congenital cervical spine problem left him with a lot of residual pain and admitted to snorting heroin to deal with it, but that he was now on methadone, which helped the pain a great deal (A.R. 1043). Upon examination, Plaintiff exhibited a restricted range of motion in all directions

8

in his cervical, thoracic, and lumbar spine, but his strength and sensation were intact (A.R. 1044).  Plaintiff was walking with and leaning on a cane and had a wide-spaced gait (A.R. 1044).  Motor strength was normal in the upper and lower extremities, and his sensory exam was intact (A.R. 1044).  Dr. Lesser prescribed Plaintiff naproxen and dexamethasone for his cervical spine osteophyte (A.R. 1045).

Plaintiff saw Joseph Strebel, M.D., with the Holyoke Medical Center Pain Management Center on referral from Dr. Lesser on January 11, 2018 (A.R. 1016).  Plaintiff reported pain in the entire area of his cervical spine and jaw, radiating down to both shoulders and his thoracic region, and in his shoulder and right arm close to his elbow (A.R. 1016).  He stated that he had throbbing aches in the anterior of his neck and also a dull ache in the pelvic area and into his right hip, with occasional pelvic numbness (A.R. 1016-1017).  Plaintiff stated that he was taking naproxen, which was helping, and that laying down with his head and neck supported helped decrease his pain (A.R. 1016).  He noted that he was unable to work and was seeking disability (A.R. 1017).  He reported difficulty with the activities of daily living (A.R. 1017).  Physical examination revealed some decreased sensation and C5 weakness on the right with normal reflexes (A.R. 1017).  Plaintiff exhibited full range of motion in the cervical, thoracic, and lumbar spine, hips, knees, ankles, shoulders and wrists (A.R. 1017).  Facet loading was positive at C4-5, C5-6, and C6-7 (A.R. 1017).  He had decreased sensation to light touch in his right hand in the C6-7 distribution (A.R. 1017).  Dr. Strebel diagnosed Plaintiff with post-laminectomy syndrome and myofascial muscle pain, but did not form a treatment plan, opting first to obtain his prior treatment records and imaging for review (A.R. 1017).

Plaintiff returned to Dr. Lesser on February 22, 2018 (A.R. 1040).  Plaintiff reported some pain relief from naproxen and cyclobenzaprine (A.R. 1040).  Dr. Lesser noted Plaintiff was

"ambulating okay," but had reduced range of motion in the cervical, thoracic, and lumbar spine (A.R. 1041).  However, motor strength was normal in the upper and lower extremities and sensory exam was intact (A.R. 1042).  Plaintiff was not interested in physical therapy because it had not helped in the past (A.R. 1041).  Dr. Lesser added a prescription for amitriptyline and suggested Plaintiff should try going to Mass Rehab (A.R. 1042).

Plaintiff presented for follow-up with Dr. Strebel on April 9, 2018 (A.R. 1057).  Plaintiff reported persistent cervical and right arm pain into his fourth and fifth digits (A.R. 1057).  Dr. Strebel noted that Plaintiff had "been provided multiple rounds of PT, varying medications including gabapentin, and multiple injections ranging from TFESI to MBB wit[h] RF" and "his pain and disability ha[d] not responded" (A.R. 1057).  Plaintiff noted difficulty with sleeping and activities of daily living secondary to pain and advised that his pain ranges from four to nine on a ten-point scale (A.R. 1057).  He noted occasional weakness when his pain was exacerbated associated with numbness and tingling (A.R. 1057).  Plaintiff exhibited tenderness to palpation of the cervical paraspinal and upper trapezius bilaterally, but had full range of motion of the cervical, thoracic, and lumbar spine, hips, knees, ankles, shoulders, and wrists (A.R. 1057).  Dr. Strebel noted that Plaintiff had exhausted conservative treatment and was not thought to be a surgical candidate in 2016 (A.R. 1058).  Dr. Strebel recommended a repeat MRI to be sure there were still no surgical options and otherwise a spinal cord stimulator trial (A.R. 1058).

Plaintiff saw Dr. Lesser again on April 18, 2018, in connection with disability paperwork (A.R. 1036).  Dr. Lesser noted that Plaintiff had "paperwork for benefits from Ma[ssachusetts] Tr[a]nsitional Assistance and despite the fact that he's young he seems to have legitimate medical reasons that should entitle him to benefits" (A.R. 1036).  Plaintiff was still "ambulating okay," but continued to exhibit restricted range of motion in the cervical, thoracic, and lumbar

spine (A.R. 1038).  Dr. Lesser refilled Plaintiff's prescriptions for cyclobenzaprine, amitriptyline, and naproxen (A.R. 1038).

Plaintiff underwent a cervical spine MRI on May 4, 2018, which showed "[m]ultifactorial mild to moderate canal stenosis, partially effacing the CSF, and moderate bilateral foraminal stenosis" at C6-C7 (A.R. 1056).  There was "[a]symmetric right-sided disc osteophyte complex mildly flattening the right side of thecal sac and resulting in mild to moderate right foraminal stenosis" at C3-C4 (A.R. 1056).

Plaintiff returned to Dr. Strebel on May 14, 2018 to discuss the spinal cord stimulator trial (A.R. 1053).  Plaintiff indicated that his pain ranged between a four and a nine on a ten-point scale (A.R. 1053).  Dr. Strebel noted that his updated cervical MRI was unchanged, and Plaintiff wished to proceed with the spinal cord stimulator trial (A.R. 1053).

C.  Hearing Testimony

Plaintiff and vocational expert Andrea Burnette ("V.E.") testified at the May 18, 2018 administrative hearing.

Plaintiff testified that in his most recent work as a garbage collection supervisor, a position which he held from 2011 to 2015, he worked 14 to 16 hours per day, with approximately 4 hours being dedicated to paperwork and the remainder spent on the road (A.R. 61, 63-64).  He stopped working in 2015 when "[his] symptoms and [his] limitations were too much to maintain [the] position" (A.R. 68).  He testified that his company offered to put him in an office position in another state, but that he declined due to concerns about his limitations and his need for so much time off work as a result of his condition (A.R. 69).  Plaintiff "was hoping that maybe the time off from work would allow [his] body to recover, but [it] only continued to get worse" (A.R. 69).

Plaintiff explained that after he stopped working, he started using heroin because he developed a tolerance to his prescribed pain medication (A.R. 69). Plaintiff's medications at the time of the hearing included naproxen, Flexeril, amitriptyline, and naprodone, as well as daily methadone (A.R. 70-71). Plaintiff stated that he gets a ride to the methadone clinic with a friend (A.R. 71). According to Plaintiff, his driver's license is suspended for nonpayment of fines, but he could not drive anyway because of the pain and because he is unable to look over his left shoulder (A.R. 71).

Plaintiff testified that he lives alone and that his daily activities include watching television and reading for up to eight hours a day and walking a very short distance to the green outside of his apartment (A.R. 72, 74-75). He said that his ability to walk is "very limited" due to pain and neuropathy in his right leg, numbness and pain in his feet, and the strain that walking puts on his neck (A.R. 75). Plaintiff testified that his ex-girlfriend and another friend help him pick up groceries and medications, prepare meals, and do laundry (A.R. 72-74). Plaintiff said that the most he can lift and carry safely is a single bag of groceries (A.R. 86).

Plaintiff testified that he suffers from neck pain that radiates up into his head and down into both shoulders (A.R. 76). According to Plaintiff, the pain starts out as "hot, radiating pain," while the pain in his shoulders feels like "hot, electrical shocks" (A.R. 77). Plaintiff said the pain is accompanied by numbness or shooting pains that radiate down into his hands and fingers, leading to tremors (A.R. 77, 81). As a result, Plaintiff has difficulty picking up and holding onto objects, opening jars and bottles, and manipulating zippers and buttons on clothing (A.R. 82). Plaintiff described the neck pain as constant and of increasing intensity with activity (A.R. 77-78). Plaintiff indicated that he has had two surgeries to his neck, but that, while he had some mild relief for a short time after the second surgery, within six months the pain was right back

where it had started (A.R. 78).  Plaintiff testified that he has tried physical therapy and injections without success (A.R. 78-79).  He has also acquired a TENS unit and inversion table, but neither relieved his pain (A.R. 80-81).  Plaintiff indicated that his doctors want to conduct a trial of a spinal cord stimulator (A.R. 79).

Plaintiff also testified to experiencing back pain in his thoracic spine, which he attributed to bulging discs and mild scoliosis (A.R. 82).  Plaintiff said that the back pain makes it difficult for him to stand, but he denied receiving significant treatment for it (A.R. 82-83).  He described the back pain as constant and of increasing intensity with activity (A.R. 83).

Plaintiff testified that he has been suffering from migraine headaches since his teen years, which result in pain behind his left eye and in the left temple and are accompanied by dizziness, nausea, and sensitivity to light (A.R. 83-84).  He described the headaches as "completely debilitating" (A.R. 84).  According to Plaintiff, he experiences these migraines anywhere from one to twelve times per month, and he has not found any medications that provide any relief (A.R. 84).

Plaintiff stated that his pain is exacerbated by humidity and, to a lesser extent, cold (A.R. 85).  He testified that he is able to sit for thirty to forty-five minutes, stand for fifteen to twenty minutes, and walk for ten minutes before becoming uncomfortable (A.R. 85-86).  Plaintiff indicated that the pain he experiences arouses him from sleep even with the medication that he has been given and that he sleeps between four and six hours on a normal night (A.R. 86-87).  Plaintiff lays down to rest during the day, but he does not sleep (A.R. 87).

Plaintiff also testified to suffering from depression and anxiety (A.R. 87-89).  He attributed his depression to feelings of isolation and his inability to work (A.R. at 87-88).  He said that at times he prefers to avoid crowds because he does not want people to see him as he is

(A.R. 89).  Plaintiff receives treatment at Providence Behavioral Health, which he has found effective at addressing his issues (A.R. 88).  Plaintiff indicated that he sometimes has problems concentrating, especially when the pain is flaring up (A.R. 90).  He has occasional memory issues and uses an app on his phone to help him remember appointments (A.R. 90).

Plaintiff testified that he has good days and bad days, with the bad outnumbering the good (A.R. 91-92).  On a bad day, the pain is so bad that he does not get out of bed and he experiences nausea and loss of appetite (A.R. 91).  Plaintiff noted that if he overexerts himself, he has had instances where it has taken him from three to five days to recover.

When it was time for the V.E. to testify, the ALJ asked her to assume a hypothetical individual with Plaintiff's characteristics, who could lift and carry up to 20 pounds occasionally and 10 frequently; who could occasionally push and pull with the bilateral upper extremities up to 20 pounds; who could occasionally perform overhead reaching with the bilateral upper extremities; who could stand and walk up to four hours and sit up to eight hours in an eight-hour day; who could occasionally stoop and climb ramps and stairs, but could not crouch, crawl, kneel, balance, or climb ladders, ropes or scaffolds with any measurable regularity; who could not tolerate exposure to hazards such as dangerous moving machinery and unprotected heights, who could tolerate only occasional exposure to extreme cold and humidity; who could understand, remember, and carry out simple instructions without strict rate, pace, or performance requirements throughout an ordinary workday and workweek with normal breaks on a sustained basis; who could respond appropriately to occasional and superficial interactions with the general public or coworkers for simple, work-related matters; and who could respond appropriately to supervisor directions and feedback for simple, work-related matters (A.R. 94-95).  The V.E. testified that such an individual could perform Plaintiff's previous work as an assembler, with

20,000 positions nationally, as well as work as an inspector or sorter, with 25,000 and 20,000

jobs nationally, respectively (A.R. 95-96).  The V.E. testified that the workforce numbers she

provided were reduced by one-half to account for standing and walking four hours at the light

exertional level (A.R. 96).  When the ALJ refined the hypothetical question to include the

additional limitation of standing and walking up to 30 minutes at one time and needing a cane to

ambulate longer distances or for walking on uneven surfaces, the V.E. testified that all three

positions would remain available (A.R. 96-97).  However, no employer would tolerate an

individual being absent twice a month on a regular basis or being off-task or simply unable to

function two hours per day (A.R. 97).

D.  <u>Opinion Evidence Regarding Plaintiff's Physical Condition</u>

*1.  State Agency Findings and Opinions*

On October 28, 2016, Dr. R. McFee completed a physical residual functional capacity

assessment of Plaintiff.  Dr. McFee found that Plaintiff could occasionally lift or carry 20

pounds, frequently lift or carry 10 pounds, and stand, walk, or sit for about six hours in an eight-

hour workday (A.R. 117-118, 135-136).  Dr. McFee determined that Plaintiff could occasionally

crawl or climb ladders, ropes, or scaffolds, and frequently climb ramps or stairs, balance, stoop,

kneel, and crouch (A.R. 118, 136).  He determined that Plaintiff was limited in his ability to

reach overhead and should avoid even moderate exposure to vibration and hazardous machinery

or heights (A.R. 119, 137).

On February 6, 2017, Dr. Wayne Draper completed another physical residual functional

capacity assessment of Plaintiff.  Dr. Draper agreed with Dr. McFee, except that he found more

severe postural limitations.  Specifically, he found that Plaintiff could only occasionally climb

ramps or stairs, balance, stoop, kneel, and crouch and never climb ladders, ropes, or scaffolds (A.R. 155-157, 172-174).

### 2. Treating Source and Other Opinions

On April 18, 2018, Dr. Lesser filled out a checkbox questionnaire regarding Plaintiff's ability to do work-related activities (A.R. 1028-1029). Dr. Lesser opined that Plaintiff could lift and carry less than 10 pounds, whether on an occasional or frequent basis (A.R. 1028). He found that Plaintiff could stand, walk, and sit less than two hours during an 8-hour workday and would need to periodically alternate sitting, standing, or walking to relieve discomfort and would need to do so at will (A.R. 1028). In particular, Dr. Lesser opined that Plaintiff could sit for twenty to thirty minutes and stand for ten to fifteen minutes before changing position and would have to walk around every five to ten minutes for five to ten minutes at a time (A.R. 1028). According to Dr. Lesser, Plaintiff would need to lie down at unpredictable intervals during the day and this would occur approximately every one to two hours (A.R. 1028). He found Plaintiff's postural limitations to consist of never twisting, stooping, crouching, or climbing stairs or ladders (A.R. 1029). Dr. Lesser listed Plaintiff's diagnoses of osteophyte of the cervical spine, cervical radiculopathy, congenital defect of the spine and a history of surgeries with post-laminectomy syndrome as supporting the limitations he identified (A.R. 1028-1029). Dr. Lesser also found that Plaintiff should avoid overhead reaching due to pain and that his reaching, fingering, pushing/pulling, handling and feeling were all affected by his impairment due to his limited range of motion and limited fine motor function (A.R. 1029). Dr. Lesser found Plaintiff's environmental restrictions to consist of avoiding concentrated exposure to solvents/cleaners, avoiding even moderate exposure to extreme cold, extreme heat, and high humidity, and avoiding all exposure to fumes, odors, dusts, gases, perfumes, soldering fluxes and chemicals

(A.R. 1029).  Dr. Lesser indicated that Plaintiff has "shown steady decline and worsening symptoms ongoing since 2010 and [is] expected to worsen" (A.R. 1029).  He opined that, on average, Plaintiff would miss more than four days of work per month (A.R. 1029).

On May 17, 2018, clinician Linda Benoit, LICSW, wrote a letter stating that she was treating Plaintiff for substance use disorder and that he had enrolled in an intensive outpatient program approximately one month earlier (A.R. 1096).  She noted that she observed Plaintiff to be physically suffering during group treatment when he struggled to remain seated and interact with others (A.R. 1096).  Also, based on his report, she stated that "his chronic health conditions appear to preclude his ability, at least presently, to get and keep gainful & remunerative employment" (A.R. 1096).

E.  The ALJ's Decision

To determine whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations.  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date (A.R. 30).  At the second step, the ALJ found that Plaintiff had a combination of severe impairments consisting of "polysubstance abuse dependence (heroin, cocaine, alcohol in remission with daily Methadone therapy; status post detoxification April 2016), mild major depressive disorder, anxiety disorder, cervical and thoracic degenerative changes (status post cervical surgery 2010 and status post C5-6 fusion April 2014)" (A.R. 30).  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (A.R. 31).  Before proceeding to steps four and five, the ALJ found that Plaintiff had the RFC to:

> perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except
> that the claimant can stand and walk up to 4 hours in an 8 hour workday and

up to 30 minutes at one time.  The claimant can sit up to 8 hours in an 8 hour workday.  The claimant can occasionally push and pull up to 20 pounds with the bilateral upper extremities.  He can perform occasional overhead reaching with the bilateral upper extremities.  He can occasionally stoop and climb ramps and stairs.  The claimant cannot crouch, crawl, kneel, balance or climb ladders, ropes or scaffolds with any measurable regularity.  The claimant cannot tolerate exposure to hazards, such as dangerous moving machinery or unprotected heights.  The claimant can tolerate occasional exposure to extreme cold and humidity.  The claimant can understand, remember and carry out simple instructions without strict rate, pace or production requirements throughout an ordinary workday or workweek with normal breaks on a sustained basis.  The claimant can respond appropriately to occasional and superficial interaction with the general public and coworkers for simple work related matters.  The claimant can respond appropriately to supervisory directions and supervisory feedback for simple work related matters.

(A.R. 32).  At step four, the ALJ determined that Plaintiff was unable to perform any past

relevant work (A.R. 38).  At step five, relying on the testimony of the V.E., the ALJ determined

that Plaintiff could perform jobs found in significant numbers in the national economy taking

into account Plaintiff's age, education, work experience, and RFC, and, therefore, Plaintiff was

not disabled (A.R. 38-39).

## IV.   Analysis

### A.   The ALJ's Treatment of Treating Source Opinion

Plaintiff's first assignment of error is that the ALJ erred by not assessing controlling

weight to Dr. Lesser's opinion as set forth in the April 18, 2018 questionnaire because Dr. Lesser

was a treating source.  Specifically, Plaintiff argues that the ALJ's "reasoning for her rejection of

the treating source opinion is incorrect."  The Commissioner contends that the ALJ's

determination to accord Dr. Lesser's opinion little weight is supported by substantial evidence.

The court agrees with the Commissioner.

The treating source rule of the Social Security Administration ("SSA"), which applies to

disability claims filed before March 27, 2017, instructs:

> the ALJ should give "more weight" to the opinions of treating physicians because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."

*Bourinot v. Colvin*, 95 F. Supp. 3d 161, 175 (D. Mass. 2015) (quoting 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)) (alteration in original).  "In the First Circuit, an opinion is 'not entitled to greater weight merely because' it is provided by a 'treating source.'"  *Smith v. Berryhill*, 370 F. Supp. 3d 282, 287 (D. Mass. 2019) (quoting *Barrientos v. Sec'y of Health & Human Servs.*, 820 F.2d 1, 2-3 (1st Cir. 1987)).  A treating source's opinion on the nature and severity of a claimant's impairment(s) is entitled to controlling weight if it: (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques;" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2).  Conversely, "[t]he regulations allow the ALJ to discount the weight given to a treating source opinion where it is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians."  *Bourinot*, 95 F. Supp. 3d at 175.  "This means that while there is a general presumption of deference to the treating physician's opinion, the ALJ can choose not to grant the opinion controlling weight if that opinion is inconsistent with other substantial evidence in the record."  *Abubakar v. Astrue*, Civil Action No. 1:11-cv-10456-DJC, 2012 WL 957623, at *8 (D. Mass. Mar. 21, 2012) (citing *Green v. Astrue*, 588 F. Supp. 2d 147, 154 (D. Mass. 2008)).  "Decisions regarding inconsistencies between a treating physician's opinion and other evidence in the record are for the ALJ, and not the [c]ourt, to resolve."  *Abubakar,* 2012 WL 957623, at *8 (citing *Costa v. Astrue*, 565 F. Supp. 2d 265, 271 (D. Mass. 2008)).

When an ALJ does not accord controlling weight to a treating source opinion, the ALJ must "explain the weight given to a treating source opinion and the reasons supporting that decision." *Bourinot*, 95 F. Supp. 3d at 176 (citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)). In evaluating a treating source opinion, the ALJ considers the following factors:

> 1) length of treatment relationship and frequency of examination; 2) nature and extent of the treatment relationship; 3) how well supported the conclusion is by relevant evidence; 4) how consistent the opinion is with the record as a whole; 5) how specialized the knowledge is of the treating physician; and 6) other factors that may be relevant.

*Abubakar*, 2012 WL 957623, at *9 (quoting 20 C.F.R. § 404.1527(d)(2)-(d)(6)).  An ALJ is not required to expressly address each factor, but must provide "good reasons" for the weight assigned to the treating source's opinion.  *Bourinot*, 95 F. Supp. 3d at 177 (quoting 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)).  "Good reasons can be provided by discussing just one factor." *Pelletier v. Astrue*, 09-10098-GAO, 2012 WL 892892, at *4 (D. Mass. Mar. 15, 2012) (citing *Green*, 558 F. Supp. 2d at 155).  "However, 'even when an ALJ does provide reasons for discounting a treating source opinion, remand is proper if those reasons are "unpersuasive" or "significantly flawed."'" *Lemieux v. Berryhill*, 323 F. Supp. 3d 224, 229 (D. Mass. 2018) (quoting *Santana v. Colvin*, No. 15-cv-13232-IT, 2016 WL 7428223, at *3 (D. Mass. Dec. 23, 2016)).

Here, the ALJ could properly choose to assign little weight to Dr. Lesser's opinion that Plaintiff was profoundly limited in his ability to walk, stand, sit, perform postural maneuvers, and use his hands.  The ALJ gave little weight to Dr. Lesser's opinion as expressed in the April 18, 2018 questionnaire because she found it to be inconsistent with (1) Dr. Lesser's actual treatment notes documenting the claimant's reported improvement with cyclobenzaprine, Naproxen, and methadone and (2) Dr. Lesser's belief that Plaintiff would be a candidate for

Mass. Rehab (A.R. 36). As to the former, during Plaintiff's first appointment with Dr. Lesser on

September 27, 2017, Plaintiff reported that methadone helped his pain "a great deal" (A.R.

1040). Plaintiff returned to see Dr. Lesser five months later, on February 22, 2018, at which time

he reported that naproxen and cyclobenzaprine were providing "some pain relief" (A.R. 1040).

As to the latter, Dr. Lesser twice recommended that Plaintiff attend Mass. Rehab, on February

22, 2018 and April 18, 2018 (A.R. 1038, 1042). Mass. Rehab is a "program [that] matches

individuals with disabilities with employers that will accommodate such disabilities." *Zingle v.*

*Astrue*, No. CIV.A. 10-30166-KPN, 2011 WL 4381739, at *7 n.1 (D. Mass. Sept. 16, 2011).

This evidence regarding the improvement of Plaintiff's symptoms with medication and Dr.

Lesser's belief that Plaintiff could and should seek an employer through Mass Rehab adequately

supports the ALJ's finding and determination to accord little weight to Dr. Lesser's opinions

about the extent of Plaintiff's limitations. *Purdy*, 887 F.3d at 13-14 (holding that if

a treating physician's "medical records of treating [the plaintiff] were at odds with his

conclusions purporting to support [the plaintiff's] application" the ALJ need not give the opinion

controlling weight).

Other treatment records, which the ALJ discussed at length and which Plaintiff does not

acknowledge, further undermine Dr. Lesser's opined limitations, insofar as they reflect

comparatively mild objective motor and sensory findings. When Plaintiff saw Dr. Oh on

December 8, 2016, he showed good strength and had good neck range of motion, although he

could not turn his head fully to the left (A.R. 556). On January 11, 2018 and April 9, 2018, Dr.

Strebel noted that Plaintiff exhibited full range of motion in the cervical, thoracic, and lumbar

spine, hips, knees, ankles, shoulders, and wrists (A.R. 1017, 1057). Finally, during Plaintiff's

appointments with Dr. Lesser on September 27, 2017 and February 22, 2018, Plaintiff's strength

and sensation were both intact (A.R. 1042, 1044).  Thus, overall, the treatment records indicate

that Dr. Lesser's stated limitations were inconsistent with the medical record as a whole.

The ALJ provided good reasons for discounting Dr. Lesser's opinion.  "An ALJ is

'entitled to resolve conflicts in the record, and may reject the opinion of the treating physician so

long as an explanation is provided and the contrary finding is supported by substantial

evidence.'"  *Oliveras v. Comm'r of Soc. Sec.*, 354 F. Supp. 3d 84, 92 (D. Mass. 2019)

(quoting *Tetreault v. Astrue*, 865 F. Supp. 2d 116, 125 (D. Mass. 2012) (citations omitted)).  The

ALJ cited substantial evidence supporting her determination that Dr. Lesser's opinion was

inconsistent with his physical examinations of Plaintiff and his recommendation that Plaintiff

pursue Mass Rehab.  *See Bourinot,* 95 F. Supp. 3d at 175; 20 C.F.R. § 404.1527(c).

Consequently, the ALJ's assignment of "little weight" to Dr. Lesser's opinion regarding physical

limitations caused by Plaintiff's spine condition does not warrant reversal or remand of the

ALJ's decision.

B.  The ALJ's Crediting of Plaintiff's Testimony

Plaintiff argues that the ALJ "improperly diminish[ed]" Plaintiff's credibility.  In

particular, Plaintiff attacks the ALJ's finding that "at the hearing, the claimant alleged radiating

pain to the right leg with numb feet.  This is not supported by the treatment notes" (A.R. 34).

According to the Plaintiff, this finding is not supported by the medical evidence, while the

Commissioner argues to the contrary.  Again, the court agrees with the Commissioner.

Pursuant to Social Security Ruling 16-3p, 2017 WL 5180304 (Oct. 25, 2017) ("SSR 16-

3p"), rather than assessing a claimant's "credibility," an ALJ is directed "to consider all of the

evidence in an individual's record when [he or she] evaluate[s] the intensity and persistence of

symptoms after [he or she] find[s] that the individual has a medically determinable

impairment(s) that could reasonably be expected to produce those symptoms." *Id.* at *2. Thus, the process is two-step. First, the ALJ must determine "whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *3. If the first step is satisfied, the ALJ then evaluates the intensity and persistence of the symptoms to determine their limiting effects. *Id.* at *4. "In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ] examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* The ALJ "will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Id.* at 5. The ALJ also uses the following factors in evaluating the intensity, persistence, and limiting effects of an individual's symptoms, insofar as they are relevant and present in the record:

> 1. Daily activities;
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *7-8.

The ALJ followed the analysis required by SSR 16-3p.  The ALJ found that Plaintiff has cervical and thoracic degenerative changes (status post cervical surgery 2010 and status post C5-6 fusion April 2014) (A.R. 30).  At the first step, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" (A.R. 34).  At the second step, the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record" (A.R. 34).  In particular, the ALJ highlighted Plaintiff's testimony regarding his "very limited . . . ability to walk" due to "pain and neuropathy in [his] right leg as well as numbness and pain in [his] feet" (A.R. 75).  The ALJ found this testimony not supported by the treatment notes (A.R. 34).

The ALJ identified two pieces of medical evidence undermining Plaintiff's testimony of radiating pain to the right leg and numb feet (A.R. 34).  On December 8, 2016, Plaintiff saw Dr. Oh for a neurosurgical evaluation (A.R. 556-557).  On examination, Plaintiff had good strength on manual motor testing, no sensory deficits, and symmetric reflexes (A.R. 556).  On May 14, 2018, Dr. Strebel noted that Plaintiff had decreased sensation to light touch in his right hand, but he denied a gait abnormality and diminished use of his extremities and had full range of motion throughout his cervical, thoracic, and lumbar spine, hips, knees, ankles, shoulders and wrists (A.R. 1053).  Thus, in accordance with SSR 16-3p, the ALJ considered both the objective medical evidence, including Plaintiff's full range of motion and lack of sensory deficit or motor disruption, combined with other evidence, including Plaintiff's statements to Dr Strebel denying gait abnormality or diminished use of his extremities, to find that Plaintiff's statements regarding the intensity, persistence, and limiting effects of his alleged leg pain and numbness were not entirely consistent with the record.

In addition, in other parts of the decision, the ALJ discussed Plaintiff's three appointments with Dr. Lesser (on September 27, 2017, February 22, 2018, and April 18, 2018), during which Plaintiff's motor strength in his upper and lower extremities was normal and his sensory exams were intact (A.R. 1038, 1042, 1044).  Finally, when Plaintiff reported to the emergency room on August 27, 2017, he denied numbness (A.R. 959).  This provides additional objective medical and other evidence to support the ALJ's finding.

Plaintiff's arguments to the contrary fail for two principal reasons.  First, Plaintiff relies on physical therapy records that pre-date his alleged onset date of December 12, 2015, which reflect some evidence of pain and numbness in his lower extremities.  Specifically, on December 13, 2014, Plaintiff complained of burning pain in his thighs and numbness going down his legs and he exhibited diminished sensation around the left medial lower leg compared with the right (A.R. 538).  On January 12, 2015, Plaintiff reported lower back pain radiating to the anterior and posterior aspect of the thighs and aching and sharp pain with burning into the right anterior thigh, and he was noted to be walking with a slightly right antalgic gait (A.R. 856).  Finally, on April 2, 2015, Plaintiff reported ongoing low back pain with intermittent radiation down the anterior right leg (A.R. 531).  However, opinions that pre-date "'a claimant's alleged onset of disability are of limited relevance.'"  *Gage v. U.S. Soc. Sec. Admin., Acting Comm'r*,  No. 17-CV-725-JL, 2018 WL 5630588, at *3 (D.N.H. Oct. 31, 2018) (quoting *Hartford v. Berryhill*, No. 17-CV-467-SM, 2018 WL 1385913, at *6 (D.N.H. Mar. 19, 2018)).   This is particularly true here where the records date to a time when Plaintiff was working 14 to 16 hours per day at a job that required significant walking, standing, and commercial driving (A.R. 63-64).

Secondly, to the extent Plaintiff cites to certain evidence post-dating his alleged date of onset that reflect some lower extremity involvement, the ALJ was not required to weigh that

evidence more heavily as Plaintiff urges.  As noted by the Commissioner, the "ALJ is not

required to read the evidence in the light most favorable to the claimant."  *Moss v. Astrue*, 2011

DNH 064, 2011 WL 1517988, at *10 n.26 (D.N.H. Apr. 21, 2011).  So long as the

Commissioner's determinations are supported by substantial evidence, they must be affirmed,

"even if the record arguably could justify a different conclusion."  *Rodriguez Pagan v. Sec'y

Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).  Further,

resolving credibility issues "and the drawing of permissible inference from evidentiary facts are

the prime responsibility of the [Commissioner]."  *Rodriguez*, 647 F.2d at 222 (quoting *Rodriguez

v. Celebrezze*, 349 F.2d 494, 496 (1st Cir. 1965)).  Plaintiff's argument for alternative inferences

and conclusions does not establish that the ALJ erred.  *Rodriguez*, 349 F.2d at 496.  Because the

ALJ's credibility determination is supported by substantial evidence, it does not provide a basis

on which to order remand.

## V.   Conclusion

For the reasons stated above, Plaintiff's motion to reverse is DENIED (Docket No. 15)

and the Commissioner's motion to affirm (Docket No. 17) is ALLOWED.

It is so ordered.

Dated: September  , 2020                    /s/ Katherine A. Robertson____
                                             KATHERINE A. ROBERTSON
                                             United States Magistrate Judge